IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOANN SANDOVAL,

        Plaintiff,

vs.                                                            Civ. No. 03-1202 LCS

JO ANNE B. BARNHART
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court upon Plaintiff's Motion to Reverse and Remand (Doc. 9) filed February 6, 2004.  The Commissioner of Social Security ("Commissioner") issued a final decision denying Plaintiff's application for disability insurance benefits as well as her application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act.  Plaintiff filed a Memorandum in support of her motion (Doc. 10); Defendant filed a Response on April 5, 2004 (Doc. 11), and Plaintiff filed her Reply on April 19, 2004 (Doc. 12).  The parties have consented to a United States Magistrate Judge conducting all proceedings in this matter, pursuant to 28 U.S.C. § 636(c).  The United States Magistrate Judge, having considered the Motion, the Memorandum, the Response, the Reply, the administrative record, and the applicable law, and being fully advised, finds the Plaintiff's motion is well-taken and should be **GRANTED**.

### Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards.  *See*

*Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Sec'y of Health and Human Svcs.*, 985 F.2d 1045, 1047 (10th Cir. 1993)(*quoting Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983)(citation omitted)). A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record. *See Emory v. Sullivan*, 936 F.2d 1092, 1093 (10th Cir. 1991)(*quoting Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990)(citation omitted)).

In order to qualify for supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *See Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. § 423 (d)(1)(a)). At the first four levels of the sequential evaluation process, the claimant must show that she is not engaged in substantial gainful employment; she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform the work she had done in the past. 20 C.F.R. § § 404.1520 and 416.920 (2004). *See Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir. 1988). At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *See Gatson v. Bowen*, 838 F.2d 442, 448 (10th Cir. 1988).

### Procedural History

Plaintiff, now 48, seeks judicial review of the final decision of the Commissioner of the Social

2

Security Administration denying her application of disability insurance benefits and SSI benefits under Title XVI of the Social Security Act.  Plaintiff filed an application for SSI payments on October 25, 2000.  R. 346.  Plaintiff alleges disability beginning on February 3, 1995.  R. 87.  Plaintiff's alleged disability was due to carpal tunnel syndrome in her right wrist, lower back pain, pain in her legs, and depression.  R. 99.  Plaintiff has a GED and past relevant work as a cashier at Furr's Supermarket. R. 143.

Plaintiff's claim was denied at the initial level on March 5, 2001 and at the reconsideration level on September 19, 2001.  R. 69-78.  Plaintiff appealed the denial of her application by filing a Request for Hearing by Administrative Law Judge.  R. 79-80.  The ALJ held a hearing on February 27, 2002 at which Plaintiff was present and testified.  R. 31.  Daniel Moriarty, a vocational expert, also testified at the hearing.  *Id.*  Plaintiff was represented by Barbara Jarvis, Esq.

Plaintiff testified before the ALJ that she last worked as a cashier.  R. 41.  She also testified that she had surgery on her right wrist in October 2001 for carpal tunnel release.  R. 42.  She explained that her hand was less numb as a result of the surgery but that she could still not use her right hand due to her inability to grasp items.  R. 42, 44.  She is able to do a little writing but if she attempts to do a lot of writing her hand gives out.  R. 43.  She testified that she could write for about five minutes at a time and could not write a one-page letter without taking a break to rest her hand. R. 54, 55.  She cannot write and has difficulty using her left hand.  R. 47, 48.  She has difficulty using her hands for buttoning her clothes and tying her shoes.  *Id.*   She gets a lot of help caring for her youngest daughter because she cannot carry her or dress her.  R. 49.  She stated that she does not use her hands a lot because the pain would be unbearable.  R. 45.  She further stated that when she tries to use her hands, they will just give out and she will drop whatever she is holding.  R. 46.

Plaintiff testified that she had not received any counseling or therapy for her depression but that she was to be referred to a counselor shortly after the hearing.  R. 46.  Plaintiff stated that she takes medication for anxiety.  R. 49.  When asked about her lower back, Plaintiff stated that she is in constant pain, that she cannot stand or sit for very long, and that her legs go numb.  R. 46.  She indicated that she could sit and stand for about an hour without a problem.  R. 46-47.   Plaintiff also indicated that she had neck pain and that she would have to lean on a chair or give her neck some sort of support in order to alleviate the pain.  R.  53.  Plaintiff stated that she cannot concentrate when reading or watching television due to her pain as well as her depression.  R. 50, 51.  She can keep her focus for about five minutes when reading and about ten minutes when watching television.  R. 50, 52.  Plaintiff also stated that she does not like to be around people.  R. 53.

In the course of the hearing, the ALJ also questioned Daniel Moriarty, a vocational expert.  R. 56-65.  The ALJ asked Mr. Moriarty to evaluate a hypothetical individual with a light functional capacity, an inability to bend or crawl, who could squat occasionally, could not be exposed to extreme temperatures or humidity, had a moderate limitation in terms of exposure to moving machinery, had a mild limitation with regard to height and driving, could not repetitively grasp, could not engage in fine manipulation, and had no more than occasional reaching forward or reaching overhead of either extremity.  R. 56.  Given these limitations, Mr. Moriarty identified two jobs that a hypothetical individual with these limitations could perform, one was an unskilled job, that of a furniture rental consultant, and the other one was a semi-skilled job, that of a gate guard.  R.  57.  Both of these types of jobs are of light exertional level, however, taking the limitations outlined in the hypothetical into consideration, Mr. Moriarty noted that at best only about 20 to 30 percent of jobs within the categories of furniture rental consultant and gate guard would be available to an individual

with such limitations.  R. 58.  Further, given the ALJ's hypothetical, unskilled sedentary work would not be available to the hypothetical individual described above because such work involves use of the hands almost exclusively.  R. 58, 63.  When adding a sit/stand option to the hypothetical, Mr. Moriarty noted he would have difficulty saying that there were a significant number of jobs available to the hypothetical individual.  R. 62, 64.  If Mr. Moriarty factored in Plaintiff's anxiety and her inability to deal with people into the hypothetical, he testified that neither furniture rental consultant nor gate guard would be jobs that the hypothetical individual could perform.  R. 65.  Mr. Moriarty also noted that the hypothetical individual would be unable to perform Plaintiff's past relevant work as a cashier.  R. 57.

The ALJ issued his decision on August 15, 2002, analyzing Plaintiff's claim according to the analysis set forth in 20 C.F.R.§ 404.1520(a)-(f) and *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).  R. 17-24.  At the first step of the sequential evaluation, the ALJ had found that Plaintiff had not engaged in substantial gainful activity since the filing of her application.  R. 18.  At the second step, the ALJ determined that Plaintiff had severe impairments consisting of physical impairments relative to carpal tunnel syndrome and degenerative disk disease.  *Id.*  The ALJ found that Plaintiff did not have a severe impairment relative to depression.  *Id.*  At the third step of the sequential analysis, the ALJ found that the severity of Plaintiff's impairments or combination of impairments did not meet or equal any of the impairments found in the Listing of Impairments ("Listings"), Appendix I, Subpart P, 20 C.F.R.§§ 401.1501-1599.  The ALJ also found that Plaintiff was not credible with regard to statements concerning the severity and limiting effects of her symptoms.  R. 21.  At step four, the ALJ found that Plaintiff retained the residual functional capacity to perform a limited range of light work activities that involved lifting of no more than 20 pounds at

a time, frequent lifting carrying of objects weighing up to 10 pounds, some pushing and pulling, occasional reaching, stopping, bending, and squatting but no requirement of repetitive use of her hands for grasping or fine manipulation, climbing, crawling, or exposure to extreme temperatures or humidity. R. 22. The ALJ further found that Plaintiff was not able to perform her past relevant work. *Id.* At the final step, the ALJ found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform and he based this finding upon the testimony of Mr. Moriarty at the administrative hearing. R. 23. Since there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, he found that she was not disabled at step five of the sequential analysis. *Id.*

Plaintiff filed a Request for Review of Hearing Decision and the Appeals Council denied Plaintiff's request for review. R-79. Hence the decision of the ALJ became the final decision of the Commissioner for purposes of judicial review. On October 17, 2003, Plaintiff filed this action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

### Administrative Record

On October 25, 2000, Plaintiff indicated on a disability report that she suffered from depression, lower back pain, pain in her legs, pain in her right wrist due to carpal tunnel syndrome, and neck pain. R. 99. She reported that she worked as a cashier as well as a receiver in grocery retail from 1976 until 1995 and had to stop working in 1995 due to carpal tunnel syndrome in her right wrist, pain in her legs, as well as depression. R. 100. As a cashier, she worked at check-out; as a receiver, she accepted merchandise from vendors. *Id.* She reported that her job required her to use machines, tools, or equipment, technical knowledge and skills, and write reports as well as supervise staff. *Id.* She indicated that the heaviest weight she lifted was 50 pounds and that she

6

frequently lifted 10 pounds.  *Id.*  She indicated that her treating physician, Dr. Rounseville, had given

her a prescription for Tranxene in order to alleviate her anxiety and depression. R. 104.

Plaintiff was also examined at the field office on October 25, 2000.  R. 108.  The claims

representative noted that Plaintiff did not have any difficulty concentrating, sitting or standing, but

had difficulty walking and walked slowly.  R. 110.

In a daily activities questionnaire dated June 25, 2001, Plaintiff indicated that she had difficulty

concentrating and needed to rest for about 30 minutes after completing an activity.  R. 123.  She

could not walk two blocks on level ground because the distance was too far.  *Id.*  Further, she did not

walk often, nor could she climb a flight of stairs at an ordinary pace.  *Id.*  She could button her clothes

at times, could pick up a pencil off the table, zip her jacket, and tie her shoes, but she could not pick

up coins off the dresser because her hands would go numb.  *Id.*  She also indicated that she had

difficulty going out in public.  R. 124.  Plaintiff had difficulty planning her days and would need help

from her daughter in order to get things done and as well as to help her make decisions. R. 124-25.

She took Tranxene for her depression.  R. 125.  Plaintiff also indicated that she took Amitriptyline

and Hydocone for her pain, and that both of these medications were first prescribed in 2001.  R. 130.

Plaintiff was seen by Dr. Mark. L. Berger, M.D., at New Mexico Neurological Associates

("NMNA") from October 1990 until February 3, 1995, the date on which Plaintiff alleges her

disability began.  R. 157-165.  NMNA reported that Plaintiff first injured her back in the mid 1980s

and as a result, suffered from lower back pain with weakness in her legs.  R. 157.  She did exercises

to maintain her strength but was involved in multiple car accidents in 1990 and 1992 which

aggravated her condition in that she began to feel numbness in her left leg and foot.  *Id.*  On February

3, 1995, Plaintiff reported that pain began in her left big toe and radiated through her calf and up to

7

her inner knee. *Id.* She described it as a constant, aching pain. *Id.* In addition to the pain in her left leg, Plaintiff reported chronic lower back pain. *Id.* The neurologic examination did not reveal any abnormal signs in Plaintiff's left upper extremity. R. 158. NMNA indicated that Plaintiff would continue podiatry care with Dr. Cohn and medical care with Dr. Rounseville and that no further neurological diagnostic studies were necessary at that time. *Id.*

Dr. Matthew L. Rounseville, D.O., was Plaintiff's treating physician from 1975 through June 2001. R. 320. The record contains medical reports from March 1995 to June 2001. R. 189-204, 312-16, 320-24. In September 1995, Dr. Rounseville reported that Plaintiff had severe low back instability, paravertebral muscle spasm and that she could not lift or bend. R. 203. In March 1996, Dr. Rounseville diagnosed Plaintiff with acute lumbosacral strain with suspected nerve root entrapment. R. 201. He gave Plaintiff a prescription for both Lodine[1] and Flexeril[2]. *Id.* In January 1999, Dr. Rounseville prescribed Plaintiff Tranxene due to her anxiety. R. 196, 309. In July 1999, Dr. Rounseville indicated that Plaintiff had gone to the emergency room due to pain in her upper abdomen extending to her back. R. 195, 308. In August 1999, he again indicated Plaintiff's chronic anxiety. R. 194, 307. Dr. Rounseville reported Plaintiff's chronic cervical and lumbar pain in August 2000. R. 193, 306. In December 2000, he noted Plaintiff's visit to the emergency room due to worsening carpal tunnel in her right hand. R. 191, 304. Plaintiff's hand was swelling and she had no grip strength. *Id.* Dr. Rounseville stated that Plaintiff had peripheral neuropathy and that Plaintiff

---

[1] Lodine is a non-steroidal anti-inflammatory drug and helps to reduce hormons that cause pain and inflammation in the body. WebMD, Medical Information, available at http://my.webmd.com/hw/drug_data/d00851a1

[2] Flexeril is a muscle relaxant that has the ability to depress the central nervous system and can be helpful in treating muscle spasms. WebMD, Medical Information, available at http://my.webmd.com/hw/back_pain/hw56184

could not work. *Id.*

In a medical record from Encino Medical Center dated February 27, 2001, there was a finding that Plaintiff suffered from degenerative disc disease at L5-S1 (lumbar and sacral vertebrae) and that there was minimal two-level disc space narrowing at the C4-5 and C5-6 (cervical vertebrae) along with spondylosis[3]. R. 188.

On June 6, 2001, Dr. John C. Adair, M.D., addressed a letter to Dr. Rounseville regarding Plaintiff. R. 246-47. Dr. Adair noted that Plaintiff had negative Tinel's signs[4] at her wrist and elbow and that she had a good range of motion in her neck. R. 247. Plaintiff also denied radicular pain into her leg from the back. *Id.* Plaintiff had full strength in her lower extremity and left upper extremity but far less than full strength of all of her right upper extremity. *Id.* With regard to Plaintiff's right hand, she had less sensation over the thumb and second digit compared to the other digits. *Id.* She also had inconsistent decreases in pinprick sensation in her right forearm. *Id.*

In June 2001, Dr. Rounseville indicated in a Residual Functional Capacity Assessment that Plaintiff could occasionally carry and lift up to 20 pounds, could never use either hand for grasping repetitively, could never use either hand for fine manipulation repetitively, could never crawl or climb, but could occasionally bend, squat, and reach. R. 314-15, 322-23. He further noted that Plaintiff was completely restricted from exposure to marked changes in temperature and humidity, was moderately restricted from being around moving machinery, mildly restricted in being in unprotected heights, and

---

[3] Spondylosis is a stiffening of the vertebra; which is often applied nonspecifically to any lesion of the spine of a degenerative nature. *Stedman's Medical Dictionary* 1656 (26th ed. 1995).

[4] Tinel's signs are a sensation of tingling felt in the distal extremity of a limb when percussion is made over the site of an injured nerve which indicates a partial lesion or early regeneration in the nerve. *Stedmans Medical Dictionary* 1619 (26th ed. 1995).

mildly restricted in driving automotive equipment.  R. 315, 323.  He also indicated that Plaintiff could work for 20 hours a week and would require rest breaks of about 10 to 15 minutes throughout the work day.  R. 313, 321.

On June 8, 2001, Dr. Eugene Toner, M.D., performed a consultative examination on Plaintiff. R. 166-174.  Plaintiff indicated in Dr. Toner's questionnaire that she could stand for 15 minutes, walk for 15 minutes, drive for 25 minutes, and sit for 30 minutes.  R. 172.  Plaintiff stated that she spent her day trying to take care of her children and that she was unable to work due to pain in her back, leg, and hand, as well as her inability to concentrate.  *Id.*  She further noted that she had to lie down about 4 times a day and that she was unable to lift things or bend down. R. 172-73.  She indicated that she could drive.  R. 173.  Dr. Toner noted that Plaintiff's gait was normal during the examination. R. 167.  He noted that her cervical and thoracic range of motion was full and her lumbar range had full forward flexion.  *Id.*  Further, she had a full range of motion in her shoulders, elbows, wrists, knees, and ankles.  R. 167-68.  Her grip strength was found to be approximately 80 percent of normal.  R. 167.  There were no evidence of Tinel's signs on her right side.  *Id.*  He also indicated that there was no atrophy to the upper or lower extremities.  R. 168.  He reported that she had degenerative disc at L5-S1 but that her complaints as far as back pain and leg weakness were not supported by objective evidence.  R. 168.  He further stated that she did not give much effort with regard to testing her leg muscle strength.  *Id.*  However, given her degenerative disc disease, he did state that Plaintiff should not be lifting over 30 pounds on an occasional basis and 20 pounds frequently.  R. 168, 170.  Dr. Toner also noted objective signs of carpal tunnel syndrome in Plaintiff's right hand and that she would have difficulty with repetitive motion of her right hand, including handling of objects and fine manipulation of her hands and fingers. R. 168, 171.  Dr. Toner noted that

Plaintiff's standing, walking, and sitting were not limited.  R. 170-71.

On July 21, 2001, Dr. Rene Gonzales, M.D., performed a psychiatric evaluation upon Plaintiff.  R. 205-07.  Plaintiff stated that she had been very depressed, was feeling hopeless, and was feeling anxious.  R. 205.  She had not seen a psychiatrist before, nor had she taken medication that would alleviate her depression.  *Id.*  Dr. Gonzales noted that she appeared to be alert and that her memory, both long and short term, appeared to be intact.  R. 206.  Dr. Gonzales diagnosed Plaintiff with major depression and determined her GAF at the time of the examination to be 50.[5]  *Id.*  With regard to work-related activities, Dr. Gonzales concluded that Plaintiff would have mild limitations with understanding and remembering detailed or complex instructions, that she would have no limitations with short and simple instructions, that she would have no limitations with sustaining concentration, carrying out instructions and working without supervision, that she would have mild limitations in her ability to interact with the public, but that she would have no limitations interacting with coworkers and supervisors.  R. 207.  Dr. Gonzales did note that Plaintiff's physical impairments could impede her ability to work.  *Id.*

On September 13, 2001, another psychiatric review indicated that Plaintiff would have mild limitations in carrying out daily activities, social functioning, and concentration as well as persistence.  R. 218.

On September 17, 2001, a Residual Functional Capacity Assessment was performed on Plaintiff.  R. 236-243.  The assessment indicated that Plaintiff could occasionally lift 20 pounds and

---

[5] The GAF scale is used to assess and individuals' overall level of functioning, including psychological, social, and occupational functioning, and it is particularly useful in planning treatment.  American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)[DSM-IV].  A GAF of 50 indicates serious symptoms or impairments (suicidal ideation, severe obsessional rituals, inability to keep a job).

could frequently lift 10 pounds. R. 237.  She could stand and/or walk for about 6 hours in an 8-hour workday and she could sit for about 6 hours in an 8-hour workday as well.  It was further determined that Plaintiff could occasionally climb, balance, stoop, crouch and crawl and could frequently kneel. R. 238.  Plaintiff would constantly be limited using both of her hands for reaching and feeling and would be constantly limited with her left hand with regard to gross and fine manipulation.  R. 239. She would occasionally be limited with her right hand with regard to both gross and fine manipulation.  R. *Id.*  The assessment further indicated that a "treating or examining statement" regarding Plaintiff's physical capacity was reviewed and that the conclusions of the treating and/or examining physician did not significantly differ from that of that the assessment.  R. 242.

On October 16, 2001, Plaintiff underwent carpal tunnel release in order to alleviate carpal tunnel syndrome in her right hand.  R. 317-18.  Dr. Moneim performed the operation.  R. 317.

On March 28, 2002, Dr. Anna Vigil, M.D., performed a neurological consultation on Plaintiff. R. 325-329.  Dr. Vigil noted that the only medical documentation that was provided her was the first three pages of a letter dated March 24, 1987 from Dr. Norman F. Moon to Mr. John Duhigg, Esq and that after her dictation, she received 8 pages of documents, including the rest of the letter from Dr. Moon to Mr. Duhigg and a 2 page note regarding Plaintiff's carpal tunnel release on October 16, 2001.  R. 325, 327.  Dr. Vigil stated that muscle strength was grossly normal and that Plaintiff was able to stand on her toes and walk on her heels.  R. 326.  Further, though Dr. Vigil reported that Plaintiff's effort was variable, Plaintiff was able to do a deep knee bend while holding onto a table for support.  *Id.*  There was no evident spasticity, rigidity, or atrophy of Plaintiff's muscles.  R. 326.  She did note there might have been some weakness in a muscle of the right hand compared to the left. *Id.*  Dr. Vigil noted that Plaintiff grimaced and had a strong pain reaction to light tapping on

Plaintiff's right wrist and that she had diminished pinprick sensation at the wrist level in her hands, mid foot, and in the feet.  R. 327.

**<u>Analysis</u>**

In her Motion to Reverse or Remand Agency Decision (Doc. 9), filed February 6, 2004, Plaintiff raises a number of issues claiming that the ALJ's decision was erroneous.  Plaintiff first contends that the ALJ erred in rejecting the opinion of Plaintiff's treating physician.  She also contends that the ALJ erred in his credibility assessment.  Third, Plaintiff alleges the ALJ erred in finding that Plaintiff had a residual functional capacity for light work.  Finally, Plaintiff asserts that the ALJ erred in finding that there were jobs that existed in substantial numbers in the national economy that Plaintiff could perform.  The ALJ's decision must be supported by substantial evidence. *Washington*, 37 F.3d at 1438.  Substantial evidence requires more than a scintilla, but less than a preponderance and is satisfied by such relevant evidence that a reasonable mind might accept to support the conclusion.  *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988).

**Dr. Rounseville's Opinion**

Plaintiff contends that the ALJ failed to account for the opinions of her treating physician, Dr. Rounseville.  The Tenth Circuit has noted that "the treating physician's opinion is given particular weight because of his 'unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.'"  *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003)(*quoting* 20 C.F.R. § 416.927(d)(2)).  The ALJ must give controlling weight to the treating physician's opinion, provided that the opinion is well-supported and is not inconsistent with other substantial evidence.  *White v. Barnhart*, 287 F.3d 903, 907 (10th Cir. 2001), 20 C.F.R. §

404.1527(d)(2).  The Tenth Circuit has held that factors to be considered in evaluating a treating physician's opinions include the opinion's consistency with other evidence, the length of the treatment relationship, the frequency of examination and the extent to which the opinion is supported by objective medical evidence.  *Id.*  Further, "[i]f an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it.  He must also give good reasons in his written decision for the weight he gave to the treating physician's opinion."  *Hamlin v. Barnhart*, No. 02-7087, 2004 U.S. App. LEXIS 8770, at *15 (10th Cir. May 4, 2004) (citation omitted).  Reviewing the record in light of these authorities, I conclude that the ALJ failed to adequately consider the opinions of Dr. Rounseville.

Dr. Rounseville began seeing Plaintiff in March 1995 and he noted in September 1995 that Plaintiff had severe low back instability, paravertebral muscle spasm and that she could not bend. R.203.  In March 1996, Dr. Rounseville diagnosed Plaintiff with acute lumbosacral strain with suspected nerve root entrapment and gave Plaintiff a prescription for Flexeril and Lodine in order to alleviate her pain.  R. 201.  He noted Plaintiff's chronic lumbar pain in August 2001.  In December 2000, Dr. Rounseville indicated that Plaintiff's carpal tunnel in her right hand was worsening, that he her hand was swelling, and that she had no grip strength.  R. 191, 304.  Dr. Rounseville noted that Plaintiff had peripheral neuropathy and could not work.  *Id.*  In June 2001, Dr. Rounseville indicated that Plaintiff could occasionally carry and lift up to 20 pounds, could never use either hand for grasping repetitively, could never use either hand for fine manipulation and could never crawl.  R. 314-15, 322-23.  He also noted that Plaintiff was completely restricted from exposure to marked changes in temperature and humidity.  R. 315, 323.  Finally, he reported that Plaintiff could work for 20 hours a week and would require rest breaks of about 10 to 15 minutes throughout the work day.

14

R. 313, 321.

In reviewing this evidence, the ALJ gave Dr. Rounseville's opinion "limited weight" and deemed it as "conclusory and inconsistent with the other medical evidence and not supported by his own clinical examinations or treatment records."  R. 22. Yet, the ALJ failed to present "sufficiently specific" reasons regarding why he rejected Dr. Rounseville's opinion.  *See Hamlin* at *15, 18.  The ALJ stated the Dr. Rounseville's opinion was not supported by his own records.  However, the ALJ failed to point to how Dr. Rounseville's opinion was "not supported by his own clinical examinations or treatment records."  Further, when stating that Dr. Rounseville's opinion was inconsistent with other medical evidence, the ALJ failed to point to the specific parts of the record with which Dr. Rounseville's opinion was purportedly inconsistent.  Moreover, in a residual functional capacity assessment conducted in September 2001, the assessment indicated that a "treating or examining statement" regarding Plaintiff's physical capacity was reviewed and that the conclusions of the treating and/or examining physician did not significantly differ from that of the assessment.  R. 242. While the assessment did not specifically note whether the records reviewed were those of Dr. Rounseville, Dr. Rounseville was Plaintiff's treating physician.  At best, the ALJ refers to medical reports from Dr. Adair and from Dr. Toner but does not specifically rely on these reports to highlight inconsistencies.

Dr. Adair stated that Plaintiff had a good range of motion in her neck and had full strength in her lower extremity.  R. 247.  However, Dr. Adair also noted that Plaintiff  had far less than full strength of all of her right upper extremity muscles and that with regard to her right hand, Plaintiff had less sensation over the thumb and second digit compared to other digits and had decreases in pinprick sensation in her right forearm *Id.*  The ALJ took no notice of this evidence and an ALJ must

not only discuss evidence that supports his decision but also "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 19996).

The ALJ also relies on a report from Dr. Toner, who found that Plaintiff had a full range of motion in her shoulders, elbows, wrists knees, and ankles. R.167-68. Dr. Toner also found that she had full cervical and thoracic range of motion and Plaintiff's gait was normal. R. 167. Her grip strength was 80 percent of normal. R. 168. He further stated that Plaintiff did not give much effort with regard to testing her leg muscle strength. *Id.* If an ALJ intends to rely on a non-treating physician's opinion, he is required to explain the weight he is giving to it. 20 C.F.R. § 416.927(f)(2)(ii). The ALJ did not explain the weight he gave to Dr. Toner's opinion. Further, Dr. Toner also noted that Plaintiff had  degenerative disc disease at L5-S1 and that she had objective signs of carpal tunnel syndrome in her right hand which would make handling of objects and fine manipulation of her hands and fingers difficult. R.168, 171. As with Dr. Adair's report, the ALJ fails to take notice of "uncontroverted evidence he chooses not to rely upon." *Chater* at 1010.

I find that the ALJ erred by rejecting the medical opinion of Plaintiff's treating physician, Dr. Rounseville, without engaging in the appropriate legal analysis. The ALJ failed to articulate specific reasons for his decision to disregard the opinion of Dr. Rounseville and  he failed to sufficiently show how Dr. Rounseville's opinion was inconsistent with other medical evidence in the record. Thus, the ALJ's decision to disregard the opinion of Dr. Rounseville was not supported by substantial evidence and must be reversed. *See Washington*, 37 F.3d at 1439.

### PLAINTIFF'S CREDIBILITY

Plaintiff next contends that the ALJ erred in finding that her complaints were not fully credible

with regard to her allegations of pain.  The ALJ stated that "to the extent that the claimant alleges an inability to perform any significant work activities on a sustained basis, her allegations and subjective complaints are not found to be fully credible."  R. 19.  Before the ALJ is even required to consider subjective evidence, "[T]he claimant must first prove by objective medical evidence the existence of pain-producing impairment that could be reasonably expected to produce the alleged disabling pain."  *Thompson,* 987 F.2d at 1488.  The framework as outlined by the Tenth Circuit is as follows: the Court must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling.  *Musgrave v. Sullivan*, 966 F.2d 1371, 1375-76 (10th Cir. 1992) (citing *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987)).  The ALJ does not question that Claimant has established a pain-producing element.  R. 18.

When determining the credibility of Plaintiff's allegations of pain, the ALJ should consider factors such as "the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence."  *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991)(citation omitted).  Thus, an ALJ's "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Hutson v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988).

In assessing Plaintiff's allegations of pain, the ALJ noted that there were significant gaps in

17

Plaintiff's history of treatment, that there were numerous occasions during which Plaintiff did not specify any particular complaint with respect to her neck, back, or her upper extremities, that Plaintiff was less than cooperative or put forth less than maximal effort during examinations, and that Plaintiff's daily activities were not as restricted as they would be for a disabled individual because she took care of her five-year-old daughter during the day and that she did some cleaning and light cooking  R. 21.

### Gaps in Treatment and Few Complaints of Pain in Neck, Back, Upper Extremities

As to the ALJ's first two bases for undermining Plaintiff's credibility, the record reflects that while Plaintiff saw Dr. Rounseville only twice between 1997 and 1998, she did see him at least three times per year in 1995, 1996, 1999 and 2000 and he had been seeing Plaintiff since 1975.  R. 189-204, 320.  Thus, it does not appear that there were large gaps in Plaintiff's treatment.  It is true that not every visit documented neck, back or upper extremity pain.  However, the records do show a history of continuing back problems and treatment.  In September 1995, Dr. Rounseville documented Plaintiff's severe low back instability coupled with paravertabral muscle spasm and that she could not lift or bend.  R. 203.  In March 1996, Dr. Rounseville diagnosed Plaintiff with acute lumbosacral strain and prescribed Plaintiff Lodine and Flexeril to alleviate her pain. R. 201.  In July 1999, Plaintiff went to the emergency room for pain in her abdomen that extended into her back.  R. 195, 308.  In August 2000, Dr. Rounseville noted Plaintiff's *chronic* lumbar pain (emphasis added).  R. 193, 306. In December 2000, Dr. Rounseville noted that Plaintiff could not work.  R. 191, 304.  Thus, the ALJ's conclusions that there were gaps in Plaintiff's treatment as well as that Plaintiff had few complaints of pain with regard to her back, neck, and upper extremities are not supported by substantial evidence and "[i]f an impairment is reasonably expected to produce some pain, allegations

18

of disabling pain emanating from that impairment are sufficiently consistent to require consideration of all relevant evidence." *Luna*, 834 F.2d at 164.

**Daily Activities**

Finally, the ALJ discounted Plaintiff's credibility due to the fact that Plaintiff indicated that she took care of her five-year-old daughter during the day and that she was able to some cleaning and light cooking. R. 46, 47. However, these were not daily activities that were easily accomplished by Plaintiff. She testified that she needed a lot of help caring for her daughter because she could not carry her or dress her. R. 46. She further testified that she when she would be cooking or using her hands in any way, her hands would give out and she would drop whatever she was holding. *Id.* Plaintiff's daily activities were further limited, as she could only sit or stand for about an hour before her legs would go numb. *Id.* Thus, even the few daily activities that the ALJ noted that Plaintiff could engage in were far from easy for Plaintiff to do. The ALJ made no reference to this testimony despite the fact that Plaintiff's testimony "went directly to some of the factors an ALJ should consider in making a credibility determination." *Hamlin*, 2004 US. App. LEXIS 8770 at *34, *See Huston* 838 F.2d at 1132. Even if Plaintiff could engage in these activities with relative ease, it does not show that Plaintiff's allegations of pain should be discredited: "the ALJ may not rely on minimal daily activities as substantial evidence that claimant does not suffer disabling pain. The sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity." *Thompson*, 987 F.2d at 1490 (citation omitted).

In sum, "[p]ain, even if not disabling, is still a nonexertional impairment to be taken into consideration, unless there is substantial evidence for the ALJ to find that the claimant's pain is insignificant." *Thompson*, 987 F.2d at 1490-91 (citation omitted). The ALJ's determination that

19

Plaintiff's allegations of disabling pain were of limited credibility is not supported by substantial evidence and must reversed.  *See Washington*, 37 F.3d at 1439.

**Conclusion**

Because I conclude that the ALJ did not follow the correct legal standards both in considering Plaintiff's allegations of pain and in considering the opinion of Plaintiff's treating physician, Plaintiff's Motion (Doc. 9) is well-taken and I reverse and remand for further proceedings so that the ALJ can reassess Plaintiff's residual functional capacity and her ability to engage in substantial gainful employment that is available in significant numbers in the national economy in light of both Dr. Rounseville's opinion as well as Plaintiff's pain allegations.   I will not reach the remaining issues raised by Plaintiff because they may be affected by the ALJ's resolution of this case on remand; those issues being Plaintiff's residual functional capacity and the vocational expert's assessment of Plaintiff's ability to perform in substantial gainful activity that exist in substantial number ins the national economy.

A Judgment consistent with this opinion shall issue.

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**